## SLEE *against* BLOOM and others.

A corporation is not dissolved by an omission to elect trustees under its charter, for more than two years, while the members, constituting an integral part of the corporation, remain *in esse;* but the old trustees continue in office, until others are elected in their stead.

Though a corporation may forfeit its charter by an abuse or neglect of its franchises, yet such forfeiture must be ascertained and declared by regular process and judgment of law, before its powers can be taken away, or the corporation be considered as dissolved.

The remedy against a corporation, for a misuser or non-user of its privileges, so as to work a forfeiture, is not in equity, but at law, by *scire facias,* prosecuted at the instance and behalf of the government, not on the application of an individual.

The *Dutchess Cotton Manufacturing Company* were incorporated for twenty years, under the act of *March* 22, 1811, *sess.* 34. *ch.* 67. (1 *N. R. L.* 245.) by the seventh section of which, it is declared, "for all debts of the company, at the time of its dissolution, the persons then composing such company, shall be individually responsible, to the extent of their respective shares of stock in the company."

At a meeting of the trustees of the company, on the 18th of *August,* 1817, at which the plaintiff, (a judgment creditor of the company, and one of the trustees,) was present, it was resolved, that any of the stockholders who had paid the sums called for on their shares, then amounting to 50 per cent., should not be proceeded against for any further calls, except by way of forfeiture of the stock. By another resolution of the trustees, of the 3d of *November,* 1817, the stockholders were to have the privilege of forfeiting their stock, on paying 30 per cent. on the amount subscribed by them : *Held,* that even if the corporation were dissolved by lapse of time, the plaintiff, as a creditor, could not enforce his claim against the individuals, beyond the extent of the resolution of the trustees, to which, as one of the trustees, he had assented : and that the stockholders who complied with the terms of the resolution of the 3d of *November,* ceased to be members of the company, or owners of shares, and were, therefore, not individually responsible.

*July 19th.* THE bill, filed the 24th of *April,* 1819, stated, that the plaintiff, being possessed of a piece of land on *Wappinger's* creek, in *Poughkeepsie,* on which he had erected a cotton

manufactory, with 912 spindles, and finding that the factory demanded greater funds than he could conveniently command, he proposed to the defendant, *George Bloom*, and others, to unite with him in a corporation, to be called "The *Dutchess* Cotton Manufactory," the stock of which was to be divided into 600 shares, of 100 dollars each. That this proposal being acceded to, the plaintiff and *G. Bloom, James Tallmadge jun. Cyrenus Crosby, George Booth*, and *Robert L. Reade*, signed and acknowledged a *certificate* of their desire to become a corporation, under that name, in the secretary's office, and became duly incorporated, on the 12th of *December*, 1814, pursuant to the act of the Legislature, passed the 22d of *March*, 1811, relative to incorporations for manufacturing purposes. (*Sess.* 24. *ch.* 67. 1 *N. R. L.* 245.) That the trustees named in the certificate of incorporation, met on the 24th of *January*, 1815, and chose their officers, to wit, the plaintiff, as president, *Crosby*, as treasurer, and *Reade*, as secretary : and it was agreed that the treasurer and secretary should confer with the plaintiff, and report the terms on which he would sell the factory, stock, and machinery, to the company. That afterwards, in *February*, 1815, at a meeting of the trustees, a report was made of the terms on which the plaintiff would sell the factory, with its stock and machinery, the amount of the terms, as reported, being 30,912 dollars; which report was accepted, and a subscription book opened, by which the subscribers promised to pay to the *Dutchess* Cotton Manufactory, one hundred dollars for every share set opposite their names. The bill set forth the names of the subscribers, and the number of shares subscribed by each. That at a meeting of the trustees, *March* 7, 1815, it was resolved, that a call of five dollars on each share should be made, payable on the 1st of *June* following. That the plaintiff, soon after, executed a deed to the company, of his factory, stock, and machinery, for the consideration of 30,900 dollars, which deed was now held by the company. That on the 1st of *May*, 1818, the plaintiff re-

1821.

SLEE
v.
BLOOM.

ceived scrip for 122 shares of stock, which he paid in full, by deducting the amount due to him from the company. That on the 30th of *September*, 1815, the plaintiff received scrip for 50 more shares, and paid up the same, in like manner. That at a meeting of the trustees, *September* 20, 1815, at which *Bloom*, *Crosby*, and others, were present, a further call was made for ten dollars on each share, payable on the 1st *Monday* of *November* then next, and the further sum of five dollars, on the 1st *Monday* of *December* following. That at a meeting, *January* 25, 1816, three persons were appointed a committee to inquire into the affairs of the corporation. That at a meeting of the stockholders, on the 20th of *April*, 1816, pursuant to public notice, seven trustees were elected. At a meeting, held *April* 27, 1816, it was resolved to make a further call of twenty-five dollars, on each share, payable on the 1st of *June* then next. That the stockholders generally neglected to make payment; and in *June*, 1816, it was resolved that suits should be commenced to enforce payment. At a meeting, *October* 19, 1816, it was resolved, that it was inexpedient to continue the factory in operation; and the plaintiff, who then superintended it, was directed to shut it up, discharge the workmen, and take care of the property; and a committee was appointed to examine the accounts, and settle with the plaintiff. At a meeting, in *November*, 1816, the committee appointed to liquidate the account of the plaintiff, reported a balance in his favour of 24,443 dollars and 35 cents; and it was resolved, that a proper voucher for the balance should be given to him. A bond to the plaintiff was, afterwards, executed, signed by the president, treasurer, and secretary, and sealed with the seal of the corporation, for 23,493 dollars and 35 cents; being the sum remaining due to him, after the stock subscribed by him, amounting to 17,200 dollars, paid up in full, was deducted from the sum due to him from the company. That the plaintiff having obtained a loan of the *Manhattan*

Company, of 10,000 dollars, which he expended in advances for the company. gave his note for that sum, dated *December* 1, 1815, endorsed by *Bloom*, *Crosby*, *Booth*, and *Cocks*, payable in twelve months, and which sum went into his account, and made part of the balance found due to him. To secure his endorsers, the plaintiff gave them a bond and warrant of attorney, to confess judgment, for 20,000 dollars, on which they entered up judgment on the 7th of *June*, 1816. That when the note became due, the plaintiff was unable to pay it, and the endorsers assumed the debt, and gave their own note to the bank for the amount, endorsed by *Nathan Myers*, and which had been in part paid by moneys collected of the stockholders, and in part by the plaintiff himself. In *January*, 1817, the plaintiff, finding himself pressed by a judgment, obtained by the endorsers of his note, commenced a suit against the company, on the bond given to him, on which a judgment was confessed and perfected in *May* term, 1817, with a stay of execution until *October* term following, for the penal sum of 46,986 dollars. The bill then stated various meetings of the trustees, in the year 1817, and their proceedings. That on the 18th of *August*, 1817, at a meeting of the trustees, it was resolved, that any person might transfer his stock, and be discharged from any future calls, on paying up the calls of 50 per cent., which had then been made, and the costs; and that no proceedings should be had to enforce the payment of further calls, other than by way of forfeiture. That on the 3d of *November*, 1817, at a meeting of the trustees, it was resolved to lease the factory for three years, and that the stockholders might have the privilege of forfeiting their stock to the Company, by paying up thirty per cent. on their shares, by ·the 1st of *December* following, which resolution was opposed by the plaintiff. That most of the stockholders had availed themselves of this resolution, and wholly abandoned the factory, and every

thing relating to it, though they had not given up their scrip. That no election of trustees had been made since *April*, 1817, and the stockholders had come to a resolution not to make another election, but to abandon the factory and corporation altogether. That in *October*, 1817, *Crosby*, *Bloom*, *Booth*, and *Cocks*, issued a *fieri facias* against the plaintiff, on the judgment against him, by virtue of which, the real estate of the plaintiff, worth 9,000 dollars, besides the land and property at the factory, became liable to sale. That in *November*, 1817, the plaintiff, hearing that an execution had been issued by *Bloom* and the others, on the judgment obtained by them against him, caused a *fieri facias* to be issued on the judgment in his favour. That in *January*, 1818, the attorney of the Company, pursuant to a previous resolution of the trustees, applied all the funds in his hands, amounting to 4,105 dollars and 59 cents, towards the payment of the note for 10,000 dollars, leaving a balance of 6,538 dollars and 58 cents. That to prevent a sacrifice of his property, to pay that balance, the plaintiff procured *George B. Evertson* to become security to the bank for that amount; and thereupon his note for the 10,000 dollars was given up, and his said endorsers wholly discharged. That to secure *Evertson*, the plaintiff, on the 21st of *January*, 1818, assigned to him all his real estate, and the avails of all the property of the Company, that might be sold under his execution against the Company. Under the execution on his judgment, the real estate of the Company was sold by the sheriff, in *February*, 1818, for 102 dollars, and the personal estate for 385 dollars and 50 cents, to *George B. Evertson*, as the highest bidder; and after deducting the sheriff's fees, there remained the sum of 460 dollars and 18 cents, to be applied toward the plaintiff's execution.

That no payment had been made on the judgment, unless the sum of 4,105 dollars, applied in part payment of the note for 10,000 dollars, be considered as part payment

of it, and that if it is so considered, there will then be a balance due to the plaintiff of 18,958 dollars and 37 cents, which he has no means of obtaining, unless the stockholders are compelled to pay up their subscriptions. That there has been no meeting of the stockholders since *May,* 1817, nor have the trustees had any meeting, or transacted any business, since *December,* 1817, but have determined to abandon and give up the factory and corporation, and not to make any further call on the stockholders, nor to provide any means whatever to pay the plaintiff; that the trustees, with all the other defendants, had determined to suffer and cause the corporation to be dissolved, and had already suffered and caused the same to be dissolved, by their said transactions and omissions, in relation thereto. That the books and records of the corporation are in the power or possession of the defendants. That there is no debt due by the corporation, except that owing to the plaintiff. That he had no means of ascertaining what amount of his debt could be obtained of the corporation, except by a legal sale of their property on execution; and although it was sold at a sacrifice, yet the plaintiff was unable, owing to his embarassments, &c., to bid upon it, or to cause it to be sold for a greater sum, and the trustees and stockholders, though they had notice of the sale, neglected all attention to it; nor did they show any disposition to preserve the property, or keep the corporation in existence, &c.

The bill *prayed,* that those of the defendants, who had made any payments on their stock, might set forth the same, and that the solvent stockholders, to wit, all the defendants, (except *Crosby,*) might be severally decreed to pay to the appellant, for his benefit, such sum or balance on each and every share of stock subscribed by them, as should be sufficient, with a due proportion to be allowed by the appellant on the fifty shares purchased by him of *James Tallmadge,* jun., *Aaron Stafford,* and *Robert Stafford,*

1821.

SLEE
v.
BLOOM.

to pay to the plaintiff the debt due to him from the said *D. C. Manufactory*, with interest, and to indemnify him for the losses he has sustained by the unjust and oppressive conduct of the trustees and stockholders; and that it might be left with the solvent defendants, and *C. Crosby*, to arrange and adjust among themselves, any claims they may have on him, by reason of any balance that may remain due and unpaid on the stock subscribed by him; and that the plaintiff might have such other and further relief, by a decree against the defendants, in their individual capacities, or as members of the said corporation, if they pretend that the same has not been already dissolved, as the nature of his case may require.

The defendants, *Bloom, Crosby, Cocks, Coolidge, Stockholm, Davis, Nelson, Thompson, Tappen, M. Hoffman, Reynolds, D. Hoffman* and *Conklin*, appeared and filed their answers.

The defendant, *Bloom*, admitted most of the material facts stated in the bill. He charged, that the plaintiff induced him and the other defendants to enter into the association, for the purchase of his cotton factory, &c., by urgent solicitations, artful assurances, and exaggerated statements of the value, profits, &c.; and among other inducements, he assured the defendant, that if he would take shares, and aid in procuring the incorporation of the company, he, the plaintiff, would at any time when the defendant wished to relinquish his shares, take back the stock, and become responsible, with good security, for what moneys the defendant might advance, payable in two years, and for any further calls on the stock. That the plaintiff's object in prosecuting the suit on the bond to judgment and execution, and having the property sold, was to regain the factory and machinery, and draw from the stockholders, their subscriptions, for the payment of his debts. That *Everlson* purchased the property for the benefit of the plaintiff, who was, in fact, the real owner,

subject only, by way of security to *Evertson*, for the sum he had assumed to pay the *Manhattan Bank*. They denied that the books and papers had been withheld from the plaintiff, but alleged that they were in his possession.

The other defendants, in their several answers, referred themselves to the answer of *Bloom*, as containing, according to their knowledge, recollection, and belief, the truth, as to the several matters stated and alleged by him ; and they set up particular grounds of defence as regarded each of them separately. The defendant *Pells* put in a separate answer, admitting the material facts in the bill, except as to the amount paid on the stock purchased by him. The bill was taken *pro confesso* against the defendants, *Robert Forrest*, *Nathan Rogers*, *Nathaniel Ferris*, *George Booth*, *S. Howard*, *J. Wintringham*, *P. Ackerman*, and *C. Livingston ;* but it was stipulated by the plaintiff, as to the two last named defendants, that he would not take a final decree against them, provided they would, severally, on their shares, pay a due proportion, according as others, under like circumstances with them, and who had put in their answers, might be compelled to pay. It was admitted, that *C. R. Livingston*, having paid thirty per cent. on her stock, had transferred it to the company ; but that *Ackerman* had not paid any thing on his stock, nor had he transferred it.

Replications were filed to the answers put in, and proofs taken in the cause.

The cause was brought to a hearing on the 31st of *March*.

*P. Ruggles*, for the plaintiff, contended, 1. That the *Dutchess* Cotton Manufactory, having been duly and legally incorporated, on the 5th of *December*, 1814, under the act, all the legal consequences incident to such an incorporation, followed, of course.

2. That the defendants, having subscribed the book in which they promised to pay the Company the sum of one

hundred dollars for every share set opposite their respective names, they became members of the corporation, interested in its property, and liable for all its debts, to the extent of the stock subscribed, by calls, during the existence of the corporation; and, by the *seventh* section of the act under which the corporation was formed, after its dissolution. (*Dutchess Cotton Manufacturing Company v. Davis*, 14 *Johns. Rep.* 238. and cases there cited.)

3. That the plaintiff was a judgment creditor of the Company to a large amount.

4. That the corporation had been dissolved by the acts of the defendants.

5. That the defendants have become liable to the plaintiff, in proportion to the amount of stock by them respectively subscribed, and remaining unpaid, according to the act.

6. That all the material allegations in the several answers of the defendants, were totally disproved; and the answers so far discredited by the testimony, that no part thereof ought to be considered as evidence, especially as to all the allegations of fraud on the part of the plaintiff.

7. That those stockholders who had paid 50 per cent. on their shares, were not discharged from the plaintiff's demand, by the resolution of the 18th of *August*, 1817, except *pro tanto*; nor could the plaintiff be restricted in his demand to 50 per cent. as to those who had paid only 30 per cent. as they had not paid according to the resolution, but had attempted to forfeit their shares.

8. That the plaintiff, being a creditor of the corporation, could not be bound by the resolution of the 19th of *October*, 1816, or that of *November* 3, 1817, as he did not assent to those resolutions; but on the contrary, protested against them.

9. That the pretended engagement of the plaintiff to take back the stock, at the option of the subscribers, was not proved; but if it were proved, it was without consideration,

and void ; and if it were valid, it could not be binding un-
til the subscribers had actually given all their interest in
the corporation or stock, to the plaintiff.

*Oakley,* contra, contended, 1. That all the stockholders
who had paid *fifty per cent.* on the amount of their sub-
scription ought to be discharged from any further contribu-
tion, in virtue of the resolution of the 18th of *August,* 1817,
by which it was resolved, that any stockholder might trans-
fer his stock, on paying the amount then called for, with
costs, if any, and that no further proceeding should be had
against any subscriber, other than by way of forfeiture of
his stock. That the plaintiff, being present at the adoption
of this resolution, ought to be bound by it.

2. That the stockholders who had paid *thirty per cent.*
on their subscriptions, and had transferred their stock,
ought to be discharged from any further contribution, by
virtue of the resolution of the board of trustees of the 19th
of *October,* 1816, and of the 3d of *November,* 1817.

3. That if any stockholder should be held bound to con-
tribute, such contribution ought not to exceed *fifty per cent.*
on the amount of his subscription, by virtue of the resolu-
tion of the 18th of *August,* 1817.

4. That in case any contribution should be decreed, the
stockholders ought not to be bound by the settlement made
with the plaintiff, by the trustees ; but the accounts ought
to be opened ; and a new account stated, having regard to
the real value of the property transferred to the Company.

5. That in case contribution should be decreed against
any of the stockholders, the plaintiff ought to account and
give them credit for the actual value of the real and person-
al property of the Company sold to *Evertson,* under the
plaintiff's judgment and execution ; such sale being in trust
for the plaintiff, or subject to his right of redemption.

6. That the stockholders are not *individually* liable to

creditors, until the period for which the Company was in-corporated, had expired; and the proper, and only remedy for creditors, was to compel the trustees to *enforce payment* of the subscriptions of the stockholders.

7. That if contribution should be decreed against any of the stockholders, the shares of those who were insolvent should be taken into the account as well as those of the others.

8. That if contribution should be decreed against any of the stockholders who should appear to have accounts with the Company, an account ought to be stated between such stockholder and the plaintiffs, allowing a private set-off.

9. That the plaintiff could not be considered as a credi-tor, in equity, as he had taken back, under his execution, the whole of the property, and received the entire amount of the earnings of the factory, together with large sums from the stockholders; and that the pretended settlement was a fraud on the stockholders not consenting to it, and was not binding on them.

10. That the factory being subject to incumbrances made by the plaintiff, a short time before he proposed the asso-ciation, the subscribers, not having any knowledge of those incumbrances, ought not to be obliged to pay.

11. That the plaintiff having obtained subscriptions, through fraud and false representations, the persons sub-scribing were not bound to make contribution to him.

12. That the fraud of the plaintiff, in imposing the pro-perty on the Company, at an amount greatly beyond its real value and cost, contrary to his engagement, ought to bar him from any claim in equity, especially, as he has now the property itself, and has appropriated to his own use all the moneys received.

13. That the demands against the defendants being, in their nature distinct, and allowing of separate and distinct

1821.

SLEE
v.
BLOOM.

ces, can no more be prosecuted in one suit in equity, then at law.

14. That the plaintiff, having examined some of the defendants, as witnesses, whereby he had waived any decree against them, he could not have a decree against the other defendants.

15. That the *corporation* ought to have been made a party to the suit; and on this bill, there can be no decree made, unless against the defendants individually.

*July* 19. The cause stood over for consideration until this day.

THE CHANCELLOR. This is a suit against the individual stockholders of the " *Dutchess Cotton Manufactory*," a company incorporated in *December*, 1814, by filing a certificate in pursuance of the act of the 22d of *March*, 1811, entitled, " An act relative to incorporations for manufacturing purposes." Every association incorporated under this act, was declared to be, for " the term of twenty years next after filing their certificate, a body politic and corporate." The bill seeks to charge the defendants personally, for a judgment debt of the incorporated company, on the ground that the corporation is dissolved, and that the members are individually responsible for the corporate debts, to the extent of their shares of stock. The 7th section of the statute declares, that for all debts which shall be due and owing by the company *at the time of its dissolution*, the persons then composing such company shall be individually responsible, to the extent of their respective shares of stock in the said company, and no further."

1. The first and leading question in the case is, whether the corporation is dissolved, so as to enable the plaintiff to call upon the individual members. It will not be disputed that without such a provision in the statute, the individuals would not be responsible in their private property, either before or after the dissolution of the company, for

1821.

SLEE
v.
BLOOM.

corporate debts. The facts from which an actual dissolution is inferred, are, that the stockholders have not elected trustees since *April*, 1817, and that the trustees have not met, as a body, since the 31st of *December*, 1817, and that all the corporate property, real and personal, was sold on an execution issued in the name, and at the instance of the plaintiff, on the 1st of *February*, 1818, and that the members have since abandoned all attention to the institution.

The bill was filed on the 24th of *April*, 1819, and it appears to me that I am not authorized, from any of the facts in the case, to consider the corporation as dissolved, at the commencement of this suit.

A corporation is not dissolved by omitting to elect trustees, under its charter, if an integral part re mains : The trustees continue in office, until others are elected in their stead.

The omission to elect new trustees, in 1818, and 1819, did not, of itself, work a dissolution, according to the opinion of the Supreme Court, in the case of the *People* v. *Runkle* ; (9 *Johns. Rep.* 147.) and by the authority of the cases there referred to, a corporate election after the year, would be good, upon general principles of law, if an integral part of the corporation remained ; and the officers already in, would continue to be good officers after the year, and until others were elected. In this case, we have the express authority of the statute under which the corporation was created, "that in case it should at any time happen that an election of trustees be not made on the day when, by the by-laws of said company, it ought to be done, the said company, for that cause, shall not be dissolved, but it shall and may be lawful on any other day to hold an election for trustees, in such manner as shall be directed by the by-laws of such company."

The members of the corporation, who are the integral part of it, are in *esse*, and I see no difficulty in a future meeting of the last elected trustees, and in a new election of trustees to be ordered and prescribed. In *Regina* v. *Ballivos* (1 *P. Wms.* 207.) vacancies of the capital burgesses were to be filled up in fifteen days, and they had neglected to fill up vacancies for 22 years, until all were extinct to one man. In so extravagant a case,

Lord Chief Justice *Parker* did not think it reasonable he should have the power of electing all the rest; but *Powel*, J., observed, that a corporation might, upon their charter day, choose a bailiff, though there was none then in being, nor had been for 20 years before. Would these Judges have hesitated, in a case like this, when there was no precise charter day mentioned in the law, to allow a new election of trustees by the the stockholders, though two years had intervened, and when the old trustees could lawfully hold over ? It seems to be too plain a proposition to be disputed.

A corporation aggregate may be dissolved within the period prescribed by its charter, in certain modes, and upon certain events, none of which have occurred in this case. It may be dissolved, if it becomes *incapable* of continuing its corporate succession, or executing its corporate functions ; as by the death of all its members, or the destruction of an integral part of it, or it may be dissolved by surrender of its franchises into the hands of the government, or by forfeiture of its charter through abuse or neglect of its franchises. The last is the alleged ground of forfeiture. in this case ; but I apprehend, that the forfeiture in such case must be judicially ascertained and declared, and that the power, which may have been abused or abandoned, cannot be taken away but by regular process. The judgment in such cases is, that the parties be ousted, or that the liberty be seized into the hands of the government. (*Rex* v. *Stevenson, Yelv.* 190.) This subject underwent great and learned discussion in the case of the *King* v. *Amery*, in the *K. B.* (2 *Term Rep.* 5?5.) and it was decided by that court, as the result of the investigation, that a corporation may be dissolved, and its franchises lost, by non-user or neglect ; but it was assumed, as an undeniable proposition, that the default was to be judicially determined in a suit instituted for the purpose. If the parties, observed *Ashhurst*, J. in delivering the opinion of the Court,

1821.

SLEE
v.
BLOOM.

A corporation aggregate may be dissolved, within the period prescribed by its charter, by the death of all its members, or the destruction of an integral part of it, or by a surrender of its franchises into the hands of the government, or by a forfeiture for non-user or mis user of its franchises. But in the latter case the forfeiture must be judicially ascertained and declared.

A corporation may be dissolved for a breach of trust; but not until it has been called upon to answer.

being called upon in a Court of justice, to state their right to the franchise, neglect or refuse to do it, or if the corporation surcease their time, they shall lose their franchise, and the judgment shall be, that the franchise be seized.   One great point in that case was, whether a corporation could be dissolved at all; and the opinion of the ten judges in the house of Lords, in 1689, was relied on to show that it could not be dissolved.   But Lord *Holt* was of opinion that a corporation could be dissolved for a breach of trust; and that seemed to be the opinion of the *K. B.* in Sir *James Smith's* case, cited, also, as the case of the *King* v. *the Mayor of London*, (4 *Mod.* 33. *Shower*, 274.) and it is no doubt the settled doctrine at this day.   But that a corporation is to be adjudged dissolved for non-user or mis-user of its franchises, until it has been called upon to answer for the breach of trust, is no where assumed. The contrary doctrine is universally taught, and it is founded on very obvious principles of justice.   In the case of *Rex* v. *Passmore*, (3 *Term Rep.* 199.) it was held that when the integral part of a corporation is gone, and the corporation had no power of restoring it, or of doing any corporate act, it was so far dissolved that the Crown might act and grant a new charter.   It was only for the crown to interfere, without a forfeiture judicially declared, and that too in in a case where the corporation was reduced to such a state as to be incapable of acting or of continuing itself; the crown might then grant a new charter, said Mr. Justice *Buller*, without "weighing very nicely whether the corporation could be said to be actually dissolved or only in danger of being so."   Lord *Kenyon* spoke in that case, with great caution, and with the admission of due limitations.   He agreed to the validity of the new charter, but said, that as to particular purposes, which do not relate to the powers of government, but to personal privileges, the corporation is not dissolved until the crown interposes.   A *scire facias* was proper when there was a legal existing body capable of

acting, but who have been guilty of abuse of power, because when a delinquency was imputed, they ought not to be condemned unheard.

Assuming the charges in the bill in this case to be true, Lord *Kenyon* points out the proper remedy : It is by the judicial process of *scire facias ;* and I believe there is no instance of calling in question the rights of a corporation, as a body, for the purpose of declaring its franchises forfeited and lost, but at the instance and on behalf of the government. In the case of *The Commonwealth* v. *Union Iusurance Company*, (5 *Tyng*, 230.) there was an application for leave to file an information, in the nature of a *quo warranto*, against the corporation, at the relation of an individual, on the charge that the corporation had been guilty of malfeasance, in not requiring from the members, payment of fifty per cent. on their subscription stock, within the time limited by the statute of incorporation, and which charge implied a gross mis-user of the powers of the corporation, and one that would incur a forfeiture of the charter.

The proper remedy against a corporation for non-user or mis-user of its franchises, is by *scire facias*, prosecuted at the instance and in behalf of the government.

Chief Justice *Parsons*, in delivering the opinion of the Court, observed, that the corporation might forfeit its franchises by nonfeasance or malfeasance ; but the information for the purpose, must be presented under the authority of the State, which must be a party to the suit, and a party to the judgment, for the seizure of the franchises. This is the more indispensable, as the State may waive the breach of any implied or express condition contained in the charter. The remedy for the non-user or mis-user of the privileges of the charter, so as to work a forfeiture, is at law, and not in this Court ; and so it was undertood in the examination of the case of the *Attorney General* v. *The Utica Insurance Company*, (2 *Johns. Ch. Rep.* 389.)

I conclude, therefore, that the corporation is still subsisting, in judgment of law, and that this Court is not authorized, from any thing that appears in the case, to consider

1821.

SLEE
v.
BLOOM.

the corporation dissolved. It follows, then, that the bill against individual members for a corporate debt, cannot be sustained.

2. Nor do I think that the plaintiff's claim could be supported, to the extent of the shares of stock owned by the individual members, even if the corporation were now dissolved, by the lapse of time. I do not allude to the fraudulent suggestions that have been made against the validity of the debt, for I am willing to suppose that these suggestions have been met and repelled ; but I refer to certain resolutions of the board of trustees, of which the plaintiff was a member, passed when he was present, and which ought, in equity, *to bar him, at least as a creditor*, from carrying his claims against the individual members beyond the provisions of those resolutions. Those resolutions were a compact between the representative and the constituent, between the trustees and the stockholders, and the plaintiff, as a party thereto, is bound, in good faith, to observe them.

The first resolution referred to, was passed on the 18th of *August*, 1817. The plaintiff, at that time, was a judgment creditor of the corporation, and his judgment was the result of a suit he had, in *January* preceding, commenced against the company. The resolution directed, that the treasurer should provide a book for the transfer of stock, and that any person might transfer upon the book of the company, the sum called for, and the arrears, first been paid in full, with the costs of suit, if any ; " and that there should be no further demands made by prosecution against any subscriber upon his subscription, nor any proceedings be had against any subscriber other than by way of forfeiture of his said stock, in case of his non-payment of any further calls." The plaintiff was present, as a trustee, and concurred in this resolution ; and at this time, the amount of the previous calls upon the stockholders, amounted to 50 dollars on a share. Here was an express stipulation, that

the only remedy against any stockholder for non-payment of future calls, should be by forfeiture of his stock, and not by prosecution. The statute under which the company was incorporated, and which may be considered as their charter, gave to the trustees power " to make such by-laws, rules, and regulations, as they should deem proper, respecting the management *and disposition of the stock*, property, and estate of the company ; and also to call and demand from the stockholders, respectively, all such sums of money by them subscribed, at such time, and in such proportions, as they should deem proper, *under pain of forfeiting the shares of the said stockholders, and all previous payments made by them*," &c. The stipulation in and by the resolution was, that the corporation would not prosecute, but proceed by way of forfeiture ; but it may be said, *that creditors* were not within the words or meaning of the resolution, and that it would not impair their right to hold individuals responsible, upon the dissolution of the company, under the 7th section of the statute. This may be true, as to creditors in general ; but I think a Court of Equity would never assist a creditor to carry his claim upon individuals, beyond the extent of that resolution, when that creditor was, at the time, present, as a trustee, and a party to the resolution.

It was a declaration to the stockholders that they could, and might rid themselves of all further responsibility, by the forfeiture of their shares. There was no exception or restriction as to existing debts ; and it is very clear that none was intended or implied at the time. The stockholders had a right to repose upon the faith of that promise, and to make their arrangements accordingly. Many of them would probably dismiss all further concern about the institution. The plaintiff no doubt deemed his judgment debt sufficiently secure under the operation of that resolution; and he, in his capacity of trustee, announced to the company how far he was willing to limit his existing demand, in his

1821.

SLEE
v.
BLOOM.

character of creditor. He cannot, therefore, in justice, nor in good faith, enforce his debt, in the face of that resolution, against the individual members, to the whole extent of their stock. He cannot be permitted in this case to discriminate between his rights as a creditor, and his acts as a trustee. There would be a mistaken casuistry in the distinction; and one which a Court of equity could not recognize: It would have the colour and effect of imposition and fraud.

The next resolution of the board of the trustees, still further limiting the demand of the corporation upon the stockholders, was passed the 3d of *November*, 1817. It was resolved, "that the stockholders of the company have the privilege of forfeiting their stock to the company, by paying 30 per cent. on the subscription list, together with the costs of suit, (if any) on or before the 1st of *December* following: and it was further resolved that the secretary of the company give notice in the papers of the village."

There is no pretence, that this resolution was passed with fraudulent views, or that the stockholders took undue means to procure it. It was an expression of the judgment and will of the trustees, declared in good faith, and upon a view and consideration of the existing circumstances of the company; and the stockholders who availed themselves of this resolution, were completely discharged; they were no longer "persons composing the company, and owners of" shares of stock, within the provision of the statute declaring such persons individually responsible, at the dissolution of the company. It would be impossible to consider the individuals who forfeited their shares upon the terms of this resolution, as any longer members of the company or owners of shares. The trustees have power, by the statute, to annex the penalty of forfeiture of shares, to the non-payment of the calls; and after forfeiture of a share, the former owner loses it, and is no longer a member, and cannot be responsible as a member. Every member whose shares were forfeited under that resolution, is wholly discharged from any responsibility for the plaintiff's debt; and

this consequence must follow, unless it could be shown, that the resolution was the result of a fraudulent combination between the trustees and the stockholders, to defraud the plaintiff. There is no colour in this case for this conclusion; and it would, therefore, appear to me, that among the twenty-two defendants in this case, there are thirteen who have a good defence under this resolution, and there are two who have a good defence under the resolution of the 18th of *August*, 1817, and one more who has paid up his shares in full; there are not more than six of the defendants who have not paid 30 per cent. on their shares.

The plaintiff was a trustee, and present when this resolution of the 3d of *November* was passed; but he protested against it, as it would not pay the debts of the factory. I apprehend, however, that the benefit of this protest, as it respected his claim against the stockholders, was waived by his subsequent conduct. The resolution was directed to be published in the *Poughkeepsie* papers, where the plaintiff resided, and it was published for three weeks, in *November*, 1817, and no notice of his dissent was mentioned in the advertisement containing a certified copy of the resolution. The stockholders had a right to presume that the resolution was with the assent of the plaintiff, and the plaintiff suffered that presumption to be drawn, without taking any public step to prevent it.

Again; by the resolution of the board, of the 1st of *December*, 1817, at which the plaintiff was present, and concurring, it was resolved, that the attorney of the company apply the funds he had in hand, belonging to the Company, to the credit of a note drawn by *Booth, Bloom, Crosby* and *Cocks*, at the *Manhattan Bank*. The resolution was passed on the day that the moneys, under the operation of the resolution of the 3d of *November*, were to have been paid in; and it was passed with a view to these very funds, which amounted to about 2,200 dollars. The note to which they

were to be applied, with the knowledge and assent of the plaintiff, was one given for and on account of a debt due from the plaintiff; and he observed to one of the witnesses, that a payment on that note was as good to him as a payment by the members on their stock. This was an instance where the plaintiff availed himself, as a trustee, of the application, for his particular benefit, of moneys paid in by the stockholders, on the faith of the resolution of the 3d of *November*, and with a view and expectation of being discharged from all further payments by the forfeiture of their shares. This was a strong ratification, on his part, of the resolution, from which he had originally dissented. He availed himself of the fruits of it; and when these fruits were the result of a confidence reposed in its validity, how could he now be permitted, by the aid of this Court, to disregard that confidence and sanction, and look beyond the resolution for further payment? Good faith would seem to require, that he should, at the time, either have acquiesced in the resolution, or should have made his dissent as public as the resolution, and have abstained from all particular and pointed participation in its results. Again; on the 26th of *December*, 1817, he was present, as a trustee, and concurred in a resolution, "that the attorney of the Company be directed to commence suits against all the persons who were subscribers to the stock of the Company, *who did not comply with the resolution of the 4th of November*, 1817." This resolution is expressly stated in the minutes of the board to have been passed unanimously; it would appear that the plaintiff was absolutely and expressly committed by this resolution, and that he is now to be deemed bound, as a party, by these acts of recognition, to the resolution of the 3d of *November*. He would, therefore, even upon the assumption of his right to look to the individuals of the Company for his corporate debt, be bound to confine his claim to those who had not complied with either of the resolutions of the 18th of *August*, or 3d of *November*, 1817;

and as to those, he could not, under the resolution of the 18th of *August*, look further than to the payment of 50 per cent. or the arrearages of the prior calls, and to the forfeiture of their shares for the residue. The plaintiff presents no very favourable claim to the equitable interposition of this Court, even to any extent. He commenced the manufacturing establishment in question on his own account, and with his own funds, and, afterwards, solicited and procured the formation of the Company to assist him, and then sold his private interest in the establishment to the Company for 30,900 dollars, on the 1st of *May*, 1815. He then had a balance liquidated and admitted in his favour, in *November*, 1816, to 23,493 dollars, and in *January*, 1817, prosecuted the Company, and in *May*, 1817, obtained judgment against them; and, on the 1st of *February*, 1818, sold on execution, the whole real and personal estate of the Company, for 460 dollars. The property which he sold, and caused to be purchased in for this almost nominal sum, he had, three years before, sold to the Company for the large consideration which has been mentioned; and the extent to which he now pushes his claim, is for the balance of 18,958 dollars left unsatisfied, after he had swept away all the stock of the Company, and virtually annihilated its credit and capital.

I shall, accordingly, declare, that the plaintiff is not entitled to sue the members of the Company, in their individual capacity, for a corporate debt, inasmuch as the corporation is not, in judgment of law, dissolved; nor can it be dissolved for any non-user or mis-user of its franchises, without due process of law; and I shall further declare, that by the resolutions of the 18th of *August*, and of 3d of *November*, 1817, (to one of which the plaintiff was a party at the time, and to the other he has given his subsequent assent and ratification,) the plaintiff would not be entitled to any claim against those defendants who have paid in 30 dollars, upon each of their shares, nor to any claim beyond 50 per cent.

or the arrearages of former calls, and the forfeiture of their shares, as to those defendants who have not paid in 30 per cent. even if the corporation was now dissolved.

The bill must be dismissed with costs, as to those defendants who have appeared and answered; and without costs, as to those defendants who have not appeared and answered.

Decree accordingly.